# STATE OF MICHIGAN

# COURT OF APPEALS

RONNIE DUNN, KEVIN ROSS, and CHARLES BLUE,

       Plaintiffs,

and

CLINT BECK,

       Plaintiff/Appellant,

v

GENESEE COUNTY ROAD COMMISSION,

       Defendant-Appellee.

UNPUBLISHED
February 2, 2016

No. 323739
Genesee Circuit Court
LC No. 13-100253-CD

---

RONNIE DUNN and KEVIN ROSS,

       Plaintiffs-Appellants,

and

CHARLES BLUE and CLINT BECK,

       Plaintiffs,

v

GENESEE COUNTY ROAD COMMISSION,

       Defendant-Appellee.

No. 323779
Genesee Circuit Court
LC No. 13-100253-CD

---

Before: SHAPIRO, P.J., and O'CONNELL and BORRELLO, JJ.

PER CURIAM.

-1-

In these consolidated appeals, in Docket No. 323739, plaintiff Clint Beck appeals by right a June 26, 2014, trial court order granting summary disposition in favor of defendant Genesee County Road Commission (GCRC) pursuant to MCR 2.116(C)(10). In Docket No. 323779, plaintiffs Ronnie Dunn and Kevin Ross appeal by right the same order. For the reasons set forth in this opinion, in Docket No. 323739, we affirm the trial court's order as to plaintiff Beck, and in Docket No. 323779, we reverse the order as to plaintiffs Dunn and Ross and remand for further proceedings.

## I. FACTS

Defendant, the GCRC, has several garages that are used in furtherance of maintaining roads in Genesee County. Between March 2011 and November 2012, the GCRC had seven open foreman positions within its maintenance department, including a position at its Swartz Creek garage. These consolidated cases involve a claim of race-based discrimination under the Elliot Larson Civil Rights Act (ELCRA), MCL 37.2101 *et seq*. with respect to GCRC's interview and hiring practice with respect to the Swartz Creek foreman position.

On November 26, 2012, the GCRC posted the maintenance foreman position for the Swartz Creek garage. The job posting listed the minimum requirements as follows: "Must have ability to make basic mathematical calculations and should have considerable background and knowledge in highway maintenance." The job posting did not indicate a preference for engineering experience, leadership experience, or applicants from other departments within the GCRC. At the time the GCRC posted the Swartz Creek position, plaintiffs/appellants Dunn, Ross and Beck, who are African-Americans, all worked within the maintenance department for the GCRC as equipment operators and it is not disputed that all three men applied for the promotion.

After the deadline for the job posting expired, Personnel Coordinator, Rachel Mullin, collected the applications and brought them to Anthony Branch, the Maintenance Director. Branch, an African-American, then selected nine applicants whom he recommended for an interview; Branch placed his recommendations into a folder and gave it back to Mullin. Branch recalled the names of some of the individuals whom he recommended for an interview including Dunn and Ross but he did not recall recommending Beck for an interview. Branch testified that Mullin maintained a record of the names that he recommended for interviews. During discovery, defendant produced a list of the following names that Branch recommended for interviews:

John Blocker, Caucasian, Maintenance Department

William Conway, Caucasian, Maintenance Department

Kimberly Day, African-American, Engineering Department

Ronnie Dunn, African-American, Maintenance Department

Rick Holtslander, Caucasian, Maintenance Department

Michael Jaeger, Caucasian, Engineering Department

Corey Jarbeau, Caucasian, Engineering Department

Kevin Ross, African-American, Maintenance Department

Ricky Schmaltz, Caucasian, Maintenance Department

Plaintiffs do not allege that Branch discriminated based on race in making these recommendations.

Mullin brought Branch's recommendations to John Daly, a Caucasian male, who was the Managing Director of the GCRC and in charge of final hiring decisions. Daly worked for the GCRC for many years in different roles and assumed responsibility for final personnel decisions from Kermit Pitts in 2010 when Pitts retired. According to Mullin, Daly took the folder, briefly looked over Branch's recommendations, selected five applicants and stated, "this is who I want to interview." It is undisputed that Daly selected the following five individuals for interviews:

John Blocker, Caucasian, Maintenance Department

William Conway, Caucasian, Maintenance Department

Kimberly Day, African-American, Engineering Department

Michael Jaeger, Caucasian, Engineering Department

Corey Jarbeau, Caucasian, Engineering Department

After Daly made his selections, he returned the folder to Mullin. Mullin testified that she maintained all nine applications in the same folder and paper-clipped the applications of the candidates who did not receive interviews. Mullin did not recall the names of the four individuals who were declined interviews. Mullin then arranged interviews for the five applicants listed above. A panel of interviewers conducted the interviews. In addition to Daly and Branch, the other panelists included the Director of Finance Melissa Williams, Director of Facilities, John Bennett, and Lead Foreman, Ron Latimer. Other than Branch, all of the panelists were Caucasian.

Mullin sat in on the interviews as an "observer." Mullin testified that all of the panelists asked the candidates questions. After the interviews were completed, Mullin excused herself to go to the restroom and when she returned she overheard someone say, "ok, it's Mike Jaeger," and Jaeger was ultimately hired as foreman at Swartz Creek.

Latimer testified that he also briefly left the room to go to the restroom after the interviews were completed. When Latimer returned, he heard Branch state that he was willing to give Jaeger a chance, but also mention that there were other candidates to consider. Latimer testified that he wanted to broaden the number of candidates that were interviewed. Latimer testified that Jaeger was the first individual hired as a maintenance foreman who had no prior experience as an equipment operator. Latimer testified that Daly did not inform him why Jaeger was hired.

Bennett testified that he was a member of the interview panel. All of the panel members asked questions during the interviews, but Daly had the authority to set the process and make the decisions. Bennett did not recall any discussion about the candidates; instead, Daly asked him who he thought "did the best," to which Bennett responded that he thought Jaeger did the best. Bennett did not know who was hired until he returned to his office after the interviews. Bennett did not hear any concerns about hiring someone from outside the maintenance department to avoid the problem of fraternization and he did not hear Daly mention that he wanted to hire someone with engineering experience.

Branch testified that he recommended plaintiffs Dunn and Ross for interviews, but he did not know why Daly declined to interview the two candidates. Branch had no recollection of Beck's application and could not recall if he recommended Beck for an interview. Branch testified that he previously informed Beck that if he wanted to be a supervisor he needed to be at work more, but he agreed that Beck met the minimum qualifications for a foreman position. Branch explained that human resources would have a record of who he recommended for interviews. In a response to an interrogatory, defendant did not included Beck's name on the list of Branch's nine recommendations.

Branch testified that Ross had good potential for leadership and Ross previously filled-in as a temporary supervisor. Branch testified that both Dunn and Ross met all of the minimum qualifications for the foreman position. Branch testified that, out of the eight maintenance foremen at the GCRC, only one of them, Dereck Horton, the second-shift foreman at the Flint garage, was African-American. Branch agreed that he and Horton previously reached a settlement agreement with the GCRC in an unrelated race-based discrimination suit.

Daly testified that when he reviewed Branch's recommendations, he wanted to select two groups, the first group of five were the individuals who ultimately were interviewed. The remaining four individuals formed the "second group," that would be interviewed in the event that the interview panel did not hire someone from the first group. Daly testified that, with respect to the first group, he chose three applicants (Jaeger, Day and Jarbeau) with an engineering background because he wanted more engineering knowledge in the maintenance department. Daly stated that he first recognized a need for more engineering influence in maintenance in 2000 and he tried to "effectuate change that I could" to that end. However, Pitts, who was in charge of hiring at the time, did not recall Daly indicating that maintenance needed more engineering experience. In addition, none of the interview panelists who testified at deposition recalled Daly indicating that he preferred candidates with an engineering background.

Daly also testified he wanted to interview applicants from outside the maintenance department "because of some of the problems that we've had with fraternization between supervisors and employees . . . In other words, people that worked alongside each other for 10 years, 15 years and all of a sudden you promote one of them to a supervisory position and then they turn around and have to supervise their friends." Daly testified that he selected Blocker and Conway for interviews "for their leadership" role because their peers elected them union representatives for their bargaining unit. Daly testified that "had we not found the person we were looking for in the [first] five, we would have gone to the next group." However, Daly did not inform any of the interview panelists of his concerns about fraternization or that he preferred

-4-

candidates with union leadership experience and Mullin did not recall Daly mentioning a second group of interviewees.

Having been denied the opportunity to interview for the Swartz Creek promotion, plaintiffs Dunn, Ross and Beck[1] commenced this suit on April 12, 2013 alleging that defendant engaged in race-based discrimination in violation of the ELCRA when defendant denied them the opportunity to interview for the foreman position because of their race.

Following extensive discovery including multiple depositions, defendant moved for summary disposition pursuant to MCR 2.116(C)(10). First, with respect to plaintiff Beck, defendant argued that Branch did not recommend Beck for an interview and that all three plaintiffs agreed that Branch, an African-American, did not discriminate based on race. Therefore, because Beck could not show that Daly declined his application based on race, he could not support a claim of race-based discrimination. Defendant cited Branch's deposition testimony wherein Branch testified that he informed Beck that he needed to be at work more if he wanted to be a supervisor. Branch did not recall recommending Beck for an interview and there was no other evidence to support that Beck was one of the nine applicants that Branch forwarded to Daly.

Second, defendant argued that plaintiffs Dunn and Ross failed to introduce any evidence to support a prima facie case of indirect discrimination under the *McDonnell Douglas*[2] burden-shifting framework where there was no evidence that the adverse employment action occurred under circumstances "giving rise to an inference of unlawful discrimination." Defendant also argued that, even assuming plaintiffs Dunn and Ross presented evidence of a prima face case, defendant presented unrebutted evidence of a legitimate non-discriminatory business reason for its decision to hire Jaeger. Specifically, defendant cited Daly's deposition testimony wherein Daly explained that he wanted to bring engineering knowledge into the maintenance department. To that end, three of the five applicants selected for interviews were from the engineering department. Additionally, Daly testified that he wanted to select individuals with good leadership qualities, which is why he selected union reps Blocker and Conway for the other two interview slots. Furthermore, Daly testified that Dunn and Ross were not "deselected," and would have been in the second group of interviewees in the event that none of the first five applicants were hired.

Defendant argued that plaintiffs Dunn and Ross failed to produce any evidence that these legitimate business reasons were a pretext for race-based discrimination. Defendant argued that there was no evidence of pretext where Branch, an African-American, was the Maintenance Director at all times during Daly's tenure at the GCRC and where the GCRC's long-tenured former Personnel Director Pitts was also African-American.

---

[1] Plaintiff Charles Blue also was a named plaintiff in the suit; however, Blue is no longer a party to the proceeding.

[2] *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973).

At oral argument before the trial court, plaintiffs conceded that they did not have direct evidence of discrimination, but instead argued that the circumstances gave rise to an inference of race-based discrimination. In particular, plaintiffs argued that Daly's proffered legitimate business reasons for the interview process amounted to a pretext for race-based discrimination where Daly deviated from the traditional practice of promoting equipment operators and where Daly did not inform anyone that he preferred engineering experience and outside applicants for the foreman position. In addition, Daly selected two Caucasian candidates without engineering experience and he did not interview any African-American men. Plaintiffs also argued that Jaeger was unqualified for the position because he could not operate any of the machinery that the maintenance operators used on a daily basis. Finally, plaintiffs argued that the lack of African-Americans in leadership positions at the GCRC was evidence of pretext.

Plaintiff Beck argued separately that he should not be dismissed from the suit because his testimony showed that he applied for the position. Although Branch could not recall if he forwarded Beck's application for an interview, Branch testified that Beck met the minimum qualifications for the foreman position and Branch could not think of a reason why he would not have forwarded Beck's application. Beck also argued that Ross testified at a deposition that Branch stated that he referred Beck for an interview. Beck's counsel conceded that if Branch did not refer Beck for an interview, then Beck did not have a claim.

The trial court granted defendant's motion as to Beck, dismissing him from the proceeding as follows:

> One situation is not particularly difficult, as I don't think Mr. Beck can remain in the case . . . He's not quite in the position of the other two . . . I think Mr. Daly didn't have any contact with Mr. Beck. He didn't have any contact with his resume. He didn't have any contact with determining, apparently, that he shouldn't be in the first five or the second four. There just doesn't appear to be a connection there between white decision-maker and the African-American intermediate decision-makers concerning Mr. Beck.

The court then proceeded to grant defendant's motion as to plaintiffs Dunn and Ross, acknowledging that the issue was a "close question." The court reasoned that engineering experience and candidates from outside the maintenance department were legitimate business reasons to justify defendant's interview process. The court explained,

> the real question is is that legitimate or was that done to keep an African-American from getting the job? It's a very close question. But I've got to be confined to the evidence.

> We have one person, Mr. Daly, who said that's what I was looking for. When I'm going through these resumes []

> Interestingly though, he said if I don't find what I'm looking for in the first five, I'm next going to look at the next four. Well, there's no engineering people. Not that I know of.

* * *

-6-

The only hesitation I have is my standard of review and that is whether, viewing in a light most favorable to the nonmoving party, can I conclude that the reasons given were pretext? I don't think I can. It's a close call. It bothers me a bit because it is such a close call and, maybe because it's a close call, it should go the other way. But it's a close call.

I just don't think on the whole record, I can conclude that this was racially motivated and it had race as its basis. I think these were legitimate reasons to have as qualifications. And I am very, very much persuaded by the fact that there were two groups, a five and a four. And if they didn't find what they were looking for in the five, then Ross and Dunn would have been considered, race or otherwise, in the four.

The trial court entered a written order on June 26, 2014. In Docket No. 323739, plaintiff Beck appealed the order as of right and in Docket No. 323779, plaintiffs Dunn and Ross appealed the same order as of right. On October 1, 2014, this Court consolidated the appeals.[3]

## II. STANDARD OF REVIEW

In both appeals, plaintiffs argue that the trial court erred in granting defendant's motion for summary disposition. "We review de novo a trial court's decision on a motion for summary disposition to determine whether the moving party is entitled to judgment as a matter of law." *Cuddington v United Health Servs, Inc*, 298 Mich App 264, 270; 826 NW2d 519 (2012). "In reviewing a motion brought under MCR 2.116(C)(10), we review the evidence submitted by the parties in a light most favorable to the nonmoving party to determine whether there is a genuine issue regarding any material fact." *Id*. "A genuine issue of material fact exists when the record leaves open an issue on which reasonable minds could differ." *Bennett v Detroit Police Chief*, 274 Mich App 307, 317; 732 NW2d 164 (2006). In reviewing a motion for summary disposition, courts must draw all "reasonable inferences" in favor of the nonmoving party, *Myers v Portage*, 304 Mich App 637, 641; 848 NW2d 200 (2014), and courts may not resolve factual disputes or determine credibility, *White v Taylor Distrib Co, Inc*, 275 Mich App 615, 625; 739 NW2d 132 (2007).

## III. GOVERNING LAW

In relevant part, the ELCRA prohibits an employer from discriminating against an employee "with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . race[.]" MCL 37.2202(1)(a). In cases such as the instant case where a plaintiff cannot produce direct evidence of racial bias,[4] "[i]n order to avoid summary

---

[3] *Dunn v Genesee Co Rd Comm*, unpublished order of the Court of Appeals, entered October 1, 2014 (Docket No. 323739); *Dunn v Genesee Co Rd Comm*, unpublished order of the Court of Appeals, entered October 1, 2014 (Docket No. 323779).

[4] As noted, plaintiffs conceded in the lower court that this was not a case involving direct-evidence of discrimination.

disposition, the plaintiff must . . . proceed through the familiar steps set forth in [*McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973)]." *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001).

Under the *McDonnell Douglas* framework, initially, a plaintiff must establish a rebuttable prima facie case of discrimination by presenting evidence that: (1) the plaintiff was a member of a protected class, (2) the plaintiff suffered an adverse employment action, (3) the plaintiff was qualified for the position, and (4) the opportunity was given to another person "under circumstances giving rise to an inference of unlawful discrimination." *Hazle*, 464 Mich at 463 (citations omitted). "When the plaintiff has sufficiently established a prima facie case, a presumption of discrimination arises . . . because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Id*. (quotation marks and citations omitted).

"[O]nce a plaintiff establishes a prima facie case of discrimination, the defendant has the opportunity to articulate a legitimate, nondiscriminatory reason for its employment decision in an effort to rebut the presumption created by the plaintiff's prima facie case." *Id*. at 464. "[T]he defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel." *Id*. at 464-465 (quotation marks and citation omitted). Rather, the defendant "has the burden of producing evidence that its employment actions were taken for a legitimate, nondiscriminatory reason." *Id*. at 464.

"If the employer makes such an articulation, the presumption created by the *McDonnell Douglas* prima facie case drops away," and the burden shifts back to the plaintiff to "demonstrate that the evidence in the case, when construed in the plaintiff's favor, is sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff." *Hazle*, 464 Mich at 465 (quotation marks and citations omitted). Specifically, "a plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for [unlawful] discrimination." *Id*. at 465-466. "A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *White v Baxter Healthcare Corp.*, 533 F 3d 381, 393 (CA 6, 2008). Our Supreme Court has explained that,

> The inquiry at this final stage of the *McDonnell Douglas* framework is exactly the same as the ultimate factual inquiry made by the jury: whether consideration of a protected characteristic was a motivating factor, namely, whether it made a difference in the contested employment decision . . . The only difference is that, for purposes of a motion for summary disposition or directed verdict, a plaintiff need only create a question of material fact upon which reasonable minds could differ regarding whether discrimination was a motivating factor in the employer's decision. [*Hazle*, 464 Mich at 466 (footnote omitted).]

We proceed with our analysis to determine whether under the *McDonnell Douglas* approach "there is a jury-submissible issue on the ultimate fact question of unlawful discrimination." *Hazle*, 465 Mich at 466.

IV.  ANALYSIS

A.  PLAINTIFF BECK (DOCKET NO. 323739)

In Docket No. 323739, Beck failed to establish a prima facie case of race-based discrimination.  Specifically, there was no evidence that Beck suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination.  *Hazle*, 464 Mich at 463.  Beck did not allege that Branch discriminated based on race when he referred nine applicants to Daly for interviews.  The alleged adverse employment action was Daly's denial of the opportunity to interview for the foreman position and Beck conceded during oral argument that if Branch did not refer his name to Daly, then he did not have a claim.  Although Beck testified that he applied for the position, there was no admissible evidence to support that Branch forwarded Beck's application to Daly for an interview.  Specifically, Branch recalled referring Dunn and Ross for an interview, but he had no recollection of forwarding Beck's application.  Branch testified that he informed Beck on one occasion that Beck needed to be at work more in order to supervise others at work, which supported that Branch did not refer Beck.  Branch also testified that human resources kept a record of the names that he forwarded to Daly.  As noted above, upon plaintiffs' request for that information, defendant produced a list of the applicants that included Dunn and Ross, but did not include Beck.  There was no other evidence on which a jury could conclude that Beck was one of the four applicants that Daly declined to interview for the position.

In the lower court, Beck cited the following deposition testimony offered by Ross to support the proposition that he was one of the applicants that Branch referred for an interview:

> *Q*.  [] Who did [Branch] recommend . . . to Mr. Daly?  Do you know?
>
> *A*.  I know he recommended me.
>
> *Q*.  Who else?
>
> *A*.  And I - - Mr. Beck was on the list, also.
>
> * * *
>
> *Q*.  Mr. Branch told you that he recommended that Mr. Beck be interviewed[?]
>
> *A*.  I knew that Mr. Beck was on the list.
>
> *Q*.  Who told you that?
>
> *A*.  Mr. Branch told me that.
>
> *Q*.  Mr.-
>
> *A*.  And the Department of Civil Rights.

-9-

*Q*. Mr. Branch told you that- -

*A*. And Mr. Beck told me.

* * *

*Q*. Are you testifying here today that Mr. Branch told you that he recommended that Mr. Beck be interviewed for the Swartz Creek job?

*A*. I'm testifying here today that Mr. Beck told me that he was on that list of people to be interviewed.

*Q*. So, not Mr. Branch, Mr. Beck.

*A*. Mr. Beck told me.

*Q*. How did Mr. Beck know that he was on the list?

*A*. The Department of Civil Rights told him.

In opposing a motion for summary disposition brought under MCR 2.116(C)(10), the non-moving party must produce admissible evidence in opposition to the motion. *Adair v State*, 470 Mich 105, 120; 680 NW2d 386 (2004). Ross' testimony did not constitute admissible evidence that Beck was one of the applicants referred for an interview. After initially stating that Branch informed him about Beck's referral, Ross clarified that he actually heard the information from Beck who obtained the information from the Department of Civil Rights. This testimony amounted to inadmissible hearsay within hearsay. See MRE 801; MRE 802; MRE 805; *Maiden v Rozwood*, 461 Mich 109, 125; 597 NW2d 817 (1999) (hearsay within hearsay is not admissible unless the proponent of the evidence establishes that both layers fall within an exception to the hearsay rule). Other than Ross' testimony, Beck fails to identify any other evidence to support that he was one of the applicants that Daly declined to interview. In short, Beck cannot show that he suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. *Hazle*, 464 Mich at 463. Therefore, Beck failed to establish a prima facie case of race-based discrimination and the trial court did not err in granting defendant's motion for summary disposition as to Beck's claim. *Id*.

B. PLAINTIFFS DUNN AND ROSS (DOCKET NO. 323779)

Applying the *McDonnell Douglas* framework to the record before us, we conclude that the trial court erred in granting summary disposition in favor of defendant with respect to Dunn and Ross.

Dunn and Ross established a prima facie case of race-based discrimination. There is no dispute that Dunn and Ross are members of a protected class who suffered an adverse employment action. *Hazle*, 464 Mich at 463. Additionally, Branch testified that both plaintiffs were qualified for the position. *Id*. Finally, a rational trier of fact could reasonably conclude that the interviews and ultimately the foreman position were given to another person under circumstances that give rise "to an inference of unlawful discrimination." *Id*. Here, Branch's

-10-

testimony showed that both Dunn and Ross were well-qualified for the foreman position and that defendant traditionally promoted equipment operators to foreman positions. Despite Branch's recommendation of both Dunn and Ross, defendant did not interview any African-American men for the foreman position and instead only interviewed Caucasian men and one African-American woman. In addition, as discussed in more detail below, defendant's proffered reasons for denying Dunn and Ross the opportunity to interview were contradicted by the evidence. Specifically, the job posting did not indicate that applicants with an engineering background, applicants from outside the maintenance department, or applicants with leadership experience were preferred. Furthermore, prior to this lawsuit, Daly never mentioned that he preferred applicants with these qualifications. Moreover, Daly interviewed two Caucasian applicants—Blocker and Conway—that were from the maintenance department and who did not have engineering experience, allegedly because both men had leadership experience within their union. However, Ross also had leadership experience as Branch testified that Ross occasionally filled in as supervisor when needed, yet, unlike Blocker and Conway, Daly denied Ross the opportunity to interview for the promotion. These circumstances were sufficient to support that defendant interviewed and hired individuals other than Dunn and Ross under circumstances that support an inference of unlawful discrimination. *Hazle*, 464 Mich at 463.

Because Dunn and Ross established a prima facie case of race-based discrimination under *McDonnell Douglas*, a presumption of discrimination arose and the burden shifted to defendant to produce evidence that it declined to interview Dunn and Ross for legitimate, nondiscriminatory reasons. *Id*. Defendant offered Daly's deposition testimony to support that it had a legitimate business reason to reject Dunn and Ross' applications. Specifically, Daly testified that he preferred candidates with an engineering background and candidates from outside the maintenance department because of his concerns about fraternization. Additionally, Daly testified that he preferred Blocker and Conway because they had leadership experience as union representatives.

While a rational jury could conclude that Daly's proffered reasons were legitimate business reasons for selecting the five candidates to interview, Dunn and Ross presented evidence that, when construed in their favor, would permit a rational trier of fact to conclude that the proffered reasons were pretextual and that discrimination was at least a motivating factor for rejecting Dunn and Ross' applications. *Hazle*, 464 Mich at 465. In particular, defendant fails to cite any evidence showing that Daly articulated the reasons as to why he selected the five candidates for interviews until after plaintiffs commenced this lawsuit. There is no evidence that Daly informed anyone before or during the hiring process that he wanted to bring more engineering experience into the maintenance department or that he was concerned with fraternization. Bennett and Latimer were on the interview panel and they testified that Daly did not mention these concerns during the interview process. In addition, while Daly indicated that he had long desired to bring more engineering experience into the maintenance department, Pitts testified that he did not recall that Daly ever mentioned the issue.

Moreover, contrary to Daly's testimony, Mullin testified that Daly did not create two "groups" of interviewees. Rather, according to Mullin, Daly selected five individuals to interview and made no reference to the other applicants being part of a "second group" of interviewees. Furthermore, the job posting did not indicate that candidates with engineering backgrounds, candidates from other departments, or candidates with leadership experience were

preferred. Moreover, with respect to Daly's alleged concern about fraternization, the longstanding tradition of the GCRC was to promote equipment operators to foreman positions, which undermined Daly's testimony regarding concerns about fraternization. Finally, Daly interviewed two Caucasian men who were from the maintenance department who did not have engineering experience, which undermined his testimony that he wanted to interview outside candidates with an engineering background. With respect to Blocker and Conway's leadership qualities, Ross had similar leadership qualities, yet he was not interviewed.

These facts and circumstances put Daly's credibility at issue. While a jury certainly could have concluded that increased engineering knowledge, fraternization, and leadership qualities were legitimate business reasons underlying the hiring process, there was no indication that Daly informed anyone that these factors were important prior to or during the interviews. Thus, viewed in a light most favorable to Dunn and Ross, a rational juror could have concluded that the proffered reasons were a pretext and that race was a factor in defendant's decision to exclude Dunn and Ross from the interview process. *Hazle*, 464 Mich at 465.

The trial court erred in applying the *McDonnell Douglas* burden-shifting framework. Specifically, the trial court stated that the critical inquiry was whether, in the court's view, defendant's proffered reasons were legitimate business reasons. The court stated, "can I conclude that the reasons given were pretext? I don't think I can," and explained "I just don't think on the whole record, I can conclude that this was racially motivated and it had race as its basis. I think these were legitimate reasons. . . ." In doing so, the court usurped the role of the jury and weighed Daly's credibility, resolved factual disputes, and ultimately concluded that, in its view, defendant's proffered reasons for hiring were legitimate and not a pretext for discrimination. This searching inquiry was not proper at the summary disposition stage of the proceeding. *White*, 275 Mich App at 625. Rather, when applying the *McDonnell Douglas* burden-shifting framework, "a plaintiff need only create a question of material fact upon which reasonable minds could differ regarding whether discrimination was a motivating factor in the employer's decision." *Hazle*, 464 Mich at 466. Thus, it was irrelevant whether, *in the court's view*, defendant declined to interview Dunn and Ross for legitimate business reasons; instead, the proper inquiry involved determining whether reasonable minds could differ on whether Dunn and Ross' race was one factor that played into defendant's decision to deny them the opportunity to interview for the foreman position. *Id.* As discussed above, when viewed in a light most favorable to Dunn and Ross, reasonable minds could differ on whether discrimination was a motivating factor in defendant's decision. *Id.* Accordingly, there were questions of fact for the jury and the trial court erred in granting defendant's motion for summary disposition as to plaintiffs Dunn and Ross. *Id.*

## V. CONCLUSIONS

In Docket No. 323739, we affirm the trial court's order granting summary disposition in favor of defendant as to plaintiff Clint Beck; in Docket No. 323779, we reverse the trial court's order granting summary disposition in favor of defendant as to plaintiffs Ronnie Dunn and Kevin Ross and remand for further proceedings consistent with this opinion. No costs awarded. MCR 7.219(A). We do not retain jurisdiction in either case.

/s/ Douglas B. Shapiro
/s/ Peter D. O'Connell
/s/ Stephen L. Borrello